UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHAEL SZABO,
    *Plaintiff*,
    *v.*
CITY OF TORRINGTON,
    *Defendant.*

Civil No. 3:14cv299 (JBA)

May 14, 2015

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is an action by Plaintiff Michael Szabo against the City of Torrington alleging violations of the Age Discrimination in Employment Act ("ADEA") of 1967, 29 U.S.C. §§ 621–34, arising out of Mr. Szabo's resignation from the Torrington Police Department following a pre-disciplinary hearing. Defendant moves [Doc. # 23] for summary judgment. Oral argument was held on May 4, 2015. For the following reasons, Defendant's motion is granted.

**I.    Background**

In August 2009, Chief Michael Maniago of the Torrington Police Department issued General Order 41-44 which instituted a quota system that required patrol officers to "perform an average of one traffic contact for each patrol shift they work." (Gen. Order 41-44, Ex. C to Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 23-2] at 3.) The officers' "monthly activity [wa]s tracked on an Officer Activity Report (OAR) and reviewed by a supervisor at the end of each month." (Maniago Decl., Ex. B to 56(a)1 Stmt. ¶ 5.) Two years into the quota program, in July 2011, Officer Hector Medina was accused of "falsifying motor vehicle stops to meet his OAR standards." (*Id.* ¶ 7.) Specifically, Officer Medina was alleged to have "called in a motor vehicle stop" the he did not actually

perform. (*Id.* ¶ 6.) In August 2011, Officer Medina resigned from the Torrington Police Department. (*Id.* ¶ 32.) He subsequently pled guilty to making false statement in the second degree, false entry by an officer, and forgery in the third degree. (*Id.* ¶¶ 33, 34.)

As a result, in September 2011, Chief Maniago directed Captain Balzano, Lieutenant Emanuel, Sargent Recchini, and Sargent Locascio to conduct an audit of all patrol officers "who issued verbal warnings to the owner/operator of [a] vehicle on traffic stops from July 10, 2011 (the date of the Hector Medina violation), working back until January 1, 2011." (*Id.* ¶¶ 36, 38.) The audit was conducted in two phases. "During the first phase of the audit, each of the auditors were assigned patrol officers from each of the shifts to audit and try to make phone contact with the owner/operators of the vehicle to verify that the stop did occur." (Locascio Decl., Ex. F to 56(a)1 Stmt. ¶ 5.) In the second phase, "a letter was sent out to . . . owner/operator[s]" who had not been reached by phone, "asking them to call . . . to discuss the stop." (*Id.* ¶ 8.)

Based on their review of the OARs, "[t]he auditors found 1290 stops that needed to be audited." (Audit Report, Ex. I to 56(a)1 at 3.) "[They] were able to call 744 phone numbers, some more than once to try to check as many stops as possible," and through these calls, they "were able to clear 443 traffic stops as legitimate stops." (*Id.*) During the second phase of the audit, "approximately 800 letters were drafted and sent out." (*Id.* at 4.) In all, between the two phases, the auditors "were able to verify 875 stops. There were 67 return to sender letters . . . and the remaining 348 people did not respond to the initial phone call or the follow up letter that was sent out." (*Id.*)

The audit revealed three "suspicious stops" made by two officers, Plaintiff and Jennifer Hayes. (Locascio Decl. ¶ 6.) "The audits of Michael Szabo and Jennifer Hayes

2

were reported to Chief Maniago and transferred to the detective division for further investigation." (*Id.* ¶ 7.) The criminal investigation was assigned to Detective Kevin Tieman. (Tieman Decl., Ex. J to 56(a)1 ¶ 4.) Detective Tieman "found that eight of Michael Szabo's motor vehicle stops were suspicious." (*Id.* ¶ 5.) "All of the eight owners/operators were interviewed and provided sworn affidavits that they were never stopped by Michael Szabo." (*Id.* ¶ 6.) On February 21, 2012, Detective Tieman and Lieutenant Emanuel interviewed Plaintiff about the stops, but Plaintiff could not recall most of the stops, explaining that they were brief and had taken place months before. (Szabo Ltr., Ex. K to 56(a)1 at 2.) "At the conclusion of the interview, Lt. Emanuel placed Michael Szabo on paid administrative leave" and suspended his police power "until further notice." (Tieman Decl. ¶ 11.)

Although Detective Tieman determined that there was "probable cause to apply for an arrest warrant for Michael Szabo charging him with 16 counts of computer crime, 6 counts of forgery in the 2nd degree, and 8 counts of false entry by a police officer related to the 8 separate reported motor vehicle stops" (Tieman Decl. ¶ 12), the State's Attorney's Office declined to prosecute (Locascio Report, Ex. D to 56(a)1 at 7). In March 2012, Sargent Locascio was assigned to conduct an internal investigation into Officer Szabo's conduct. (*Id.*) As part of that investigation, Sargent Locascio interviewed Officer Szabo on March 19, 2012. (*Id.* at 10.) In June 2012, Sargent Locascio concluded his investigation and issued a report finding the charges against Officer Szabo had been substantiated. (*Id.* at 29.)

A pre-disciplinary hearing was held on June 28, 2012 (*see* Ltr. Dated June 19, 2012, Ex. M to 56(a)1), which Mr. Szabo attended with Union Attorney Lars Edeen

3

(Szabo Dep. at 60). During the hearing, Chief Maniago told Plaintiff that he would recommend his termination, but that only the Board of Public Safety had the power to terminate him. (Maniago Decl. ¶¶ 56–57.) At the conclusion of the hearing, Mr. Edeen informed Mr. Szabo that the City's attorney had agreed that if Plaintiff resigned, he would not lose his pension benefits. (Szabo Ltr. at 10.) Thereafter, City Attorney Victor Muschell faxed Mr. Edeen a written settlement agreement in which the City agreed to pay Mr. Szabo's "comp time," accrued vacation, twenty percent of his accumulated sick time, his pension, and his medical insurance if he resigned by July 3, 2012. (*See* Settlement Offer, Ex. O to 56(a)1 at 2.) On July 2, 2012, Officer Szabo resigned from the Torrington Police Department. (Resignation Ltr., Ex. P to 56(a)1.)

## II. Legal Standard

Claims brought pursuant to the ADEA are subject to the three-part burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). At step one, the plaintiff bears the burden of establishing a prima facie case by proving that: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) circumstances existed giving rise to an inference of discrimination on the basis of his membership in the protected class. *See McDonnell Douglas Corp.*, 411 U.S. at 802.

Once the plaintiff has established a prima facie case, "the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). "If the defendant proffers a legitimate non-discriminatory reason for a challenged employment action, the

presumption raised by the prima facie case is rebutted, and drops from the case." *Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999) (internal citations and quotation marks omitted). "The plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, and that [age] was." *Id.* (internal citations and quotation marks omitted). "'A plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Gorzynski*, 596 F.3d at 106 (quoting *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)).

### III.  Discussion[1]

In moving for summary judgment, Defendant puts forth three arguments: (1) Plaintiff has not demonstrated that an adverse action was taken against him because he voluntarily resigned; (2) if Plaintiff's resignation could be construed as an adverse action, he still has not proved that the adverse action was because of his age; and (3) even if

---

[1] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Plaintiff has made out a prima facie case, Defendant has stated a legitimate non-discriminatory reason for its actions which Plaintiff has failed to rebut.[2]

### A. Prima Facie Case

Defendant concedes that Plaintiff was a member of a protected class and that he was qualified for his position, so only the third and fourth elements of the prima facie case are in dispute. However, because the fourth element is dispositive, the Court need not decide the third element. For the purposes of this motion, the Court assumes that Plaintiff suffered an adverse action when he was given the choice to resign and keep his pension benefits or go before the Board of Public Safety and potentially lose his pension benefits.

Nonetheless, Plaintiff's claim fails because he has not established any facts from which an inference of age discrimination may be drawn. Plaintiff argues that such an inference is appropriate here because the record does not "indicate that younger officers were investigated." (Opp'n [Doc. # 25] at 2.) The Court disagrees. While it is true that Defendant never explicitly states that officers younger than 40 were investigated, it does contend, and Plaintiff admits, that it audited "all department members who work, or

---

[2] In making its case, Defendant relies in part on findings by the Unemployment Security Division of the Connecticut Department of Labor, in relation to Mr. Szabo's application for unemployment benefits. (*See, e.g.,* Ex. Q to Loc. R. 56(a)1 Stmt.) Plaintiff argues that these findings should be disregarded by the Court because under Connecticut law, "[n]o findings of fact or conclusions of law contained in a decision of an employment security appeals referee, board of review or a court, obtained under this chapter, shall have preclusive effect in any other action or proceedings, except proceedings under this chapter." Conn. Gen. Stat. § 31-249g(b). While Defendant does not appear to argue that the agency's findings should be given preclusive effect, absent such argument, it is not apparent what relevance the findings have to these proceedings. Therefore, the Court will disregard the agency's findings in its analysis.

worked with the patrol division, with the rank of patrol officer, who issued verbal warnings to the owner/operator of the vehicle on traffic stops from July 10, 2011 (the date of the Hector Medina violation), working back until January 1, 2011." (Loc. R. 56(a)(1) Stmt. ¶ 37; Loc. R. 56(a)2 Stmt. ¶ 37; Maniago Dep. ¶ 38.) Among the audited officers were nineteen officers over forty years old. (*See* Maniago Decl. ¶ 67.) "[T]he auditors found three (3) suspicious stops, done by two (2) officers, Michael Szabo and Jennifer Hayes." (Loc. R. 56(a)(1) Stmt. ¶ 40; Loc. R. 56(a)2 Stmt. ¶ 40.) "At the completion of the entire audit, the auditors did not find any additional suspicious motor vehicle stops." (Loc. R. 56(a)(1) Stmt. ¶ 45; Loc. R. 56(a)2 Stmt. ¶ 45.) The fact that the only three suspicious stops discovered by the auditors were conducted by two officers over age forty is not sufficient to raise an inference of discrimination where *all* patrol officers were audited and seventeen officers over age forty did not face disciplinary charges as a result of the audit.

### B. Legitimate Non-Discriminatory Reason

Finally, even assuming, *arguendo*, that Plaintiff has made out a prima facie case of discrimination on the basis of age, he has failed to rebut Defendant's assertion that it had a legitimate non-discriminatory reason for its actions. Defendant claims, and Plaintiff does not dispute, that the City initiated the audit after Officer Medina's falsified records were discovered because it feared that other officers had similarly falsified records. (Maniago Decl. ¶ 35.) Plaintiff has put forth no evidence to demonstrate that this seemingly legitimate rationale was pretextual. Rather, Plaintiff's only argument is that Defendant has not shown that any of the officers investigated were under age forty, and

7

for the reasons stated above, no reasonable factfinder could find any inference of age discriminatory motivation by Defendant.

## IV.     Conclusion

Defendant's Motion [Doc. # 23] for Summary Judgment is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of May, 2015.